So if you'd like to make a rebuttal argument, please try to stop while that clock still has time on it. Very good. Thank you very much. Good morning, Your Honors. May it please the Court, Counsel. My name is Randolph Hammock. I do represent the appellants in this case. With all due respect, this is a case about discrimination. Very simple. Nothing more, nothing less. What is the discrimination we're talking about? Let's cut to the chase. We're talking about discrimination against bikers. More specifically, biker gangs, gangs, biker gangs, notorious biker gangs. That's how they perceive my clients, the top hatters. They are an illegal biker gang not worthy of going into their fairgrounds. Now, what the Gilroy Garlic Festival has said in their brief and consistently throughout this litigation is that they have a right to suppress those, quote, discoordinate views. That's the words they use, discoordinate views. What are these discoordinate views that my clients are expressing by wearing their colors, their patches? This is what they say. One, family values. This goes against family values. Two, alternative lifestyles. It promotes alternative lifestyles. And three, and this was kind of done after the fact as sort of a pretextual reason, there's a threat to public security. In other words, they have some fear that rival biker gangs, the top hatters, are going to come into a fisticuffs with the Hessians or the Mongols or the Hells Angels or other type of 1 percent motorcycle groups. The evidence doesn't support that. And more importantly, in this particular case, how does the Gilroy Garlic Festival with the connection with the city of Gilroy, the police department, how do they go around suppressing these, quote, discoordinate views? Address code. Yes. In fact, all the members of the club will probably have a different answer to some degree. Thirty five, 40 members. OK. In that issue, and I respect that issue, I think it's a legitimate, fair issue for this Court to be concerned with, because it does come to the primary issue in this case, as I see it, is was the plaintiff's wearing of their club patches, their colors, was that expressive conduct of speech worthy of First Amendment protection? The district court, in answering that question, said no. But under this Court's own precedent, and under its own case as well as relevant United States Supreme Court's, which I'm going to discuss, the district court was incorrect in that analysis. The district court published opinion in FSUP. When you read their opinion on this issue, the district court talks about, and they have got the arguments put forth by the appellees in this particular case, that there is a message that is easily understood or likely to be understood by the public. And because we don't have this particularized message, in other words, all four people, plaintiffs said four different things. And interestingly enough, I want to comment on this, because this was in the record. One of them said, and I thought this was interesting, the skull was because underneath everyone's skin were all the same people. You know, that's a message of using a skull. And the wings, Harley-Davidson wings, are typical with freedom, a free lifestyle, a freedom to roam the country. There are messages in those things. And I just thought that was an interesting message. But going to the point, the district court adopted their analysis, and with all due respect, that's an incorrect analysis, because the Hurley case, the Supreme Court, United States Supreme Court and Hurley, specifically disavowed and put in serious question that analysis. In Hurley, if you recall, that was the marching in the Boston parade, and it was a group of different people, Irish-Americans, gays, lesbians, bisexuals, and they formed this group, and they had a banner. And the banner said, quote, Irish-American, gay, lesbian, bisexual group of Boston. And all these different various groups with different agendas, different viewpoints, no particularized message, nothing really that any particularized message is going to be understood. They wanted to march in this parade. And they said, no, you can't march in this parade. And the Supreme Court, in the Hurley decision, analyzed that. And they basically, in essence, overruled that part of the Johnson-Spence test, which said that you need to have this particularized message, or you need to have it be able to be readily understood by the public. That's not necessarily the truth. That's not necessarily the test anymore. And I'll quote from that Supreme Court decision. It said, the Supreme Court explained that, quote, a narrow, succinctly articulate message is not a condition of constitutional protection, which, if confined to expressions conveying a particularized message, which never – would never reach the unquestionably shielded painting of Jackson Pollard, music of Arnold Schoenberg, or jabberwocky verse of Lewis Carroll. And further on, it said, by establishing that, quote, a private speaker does not forfeit constitutional protection simply by combining multifarious voices or by failing to edit their themes to isolate an exact message as to the exclusive subject of the speech, matter of the speech. In other words, you can have divergent views, and you don't have to have this particular message anymore. I would respectfully submit that the test that was used, that was offered by the appellees in this case, that Johnson-Spence test, and that you need this particular message and it needs to be understood by the public, is no longer the test under the United States Supreme Court. How would you state what you believe is the current standard? Johnson-Spence has modified, if it is, by the later case. Okay. There are several decisions that have discussed that issue. One I just looked at. It was a Tentafly decision at 390 F. 3rd, 144. I think that was the second or third district case. They addressed that issue, and they said, quote, considering the nature of the activity combined with the factual context, and environment in which it was undertaken, what you need to look at, whether the activity was sufficiently imbued with elements of communication to fall within the scope of the First Amendment. So what does that mean? We have a patch. Let's get down to the bare facts. We have a patch here. All right? Now, look at the history of patches. There is a long, long history of patches and what they mean particularly in this country. For example, unions have them. Boy Scouts of America have them. Army personnel, military have them. Many, many various groups have patches. In fact, under Federal law, patches are specifically copyrightable as a matter of Federal law, and moreover, there is even a criminal statute that prevents the counterfeiting of patches, and that's 18 U.S.C. 2320. But this Court, the Ninth Circuit, has specifically addressed the issue of whether the wearing of a patch, in fact, the wearing of a motorcycle patch, is expressive conduct. Sam Martano. That's the case. I'm relying heavily upon Sam Montaro on that case. Sam Montaro, that was a case that was decided a few years ago by this Court, Ninth Circuit. What's the citation to that case? All right. And the citation is – it's certainly in my brief, Your Honor, and I've discussed it at great length. Okay. But it's in your brief. It is in my brief. And right away, when – Ninth Circuit. Ninth Circuit. And let's – here, I have it right in front of me, and I wanted to – this is an important point, if I could just find – oh, here it is. First of all, I want to note this. In the oral argument on the summary judgment motion, this is what the Court said when we – we started talking about Sam Martano on page 42. This is lines 9 through 17. The Court. It has occurred to me in dealing with this problem that there is a huge overbreath problem that might occur if there is a violation of the First Amendment. But that's why I have the threshold question still pending. And Sam Martano is the case you're citing, and that's the authority I'll look at to see whether or not it carries the day for you in terms of whether or not this is expressive conduct. So the Court recognized that that's the issue we need to look at and look at that case. Unfortunately, I was quite surprised when the Court issued its opinion, a published opinion, many, many pages, it never once even cited Sam Martano. Didn't even cite it. Didn't even recognize it. Didn't even discuss it. So let's look at Sam Martano. Well, I respectfully disagree, Your Honor. Let's look at the Sam Martano case. It involved three separate incidents at the courthouse. The first time, four different motorcycle club members went. There were members of different groups, the Rugged Few, a couple other motorcycles, including the Hells Angels. There was a second incident in which, again, several motorcycle groups went, Hells Angels, Vagos, Hessians, Sons of Silence. They went. And then the third person was Sam Martano. But all of them were the plaintiffs, Your Honor, in that case. All of them were the plaintiffs. Your Honor, what the case is about is yes. It's not about just Mr. Sam Martano and his patch. You read the case. Okay. Okay. I apologize. I can't. I have the relevant part I would like the Court to consider. It is. Right off the bat, these are the first words from the Sam Martano case. Appellants, plural, in this action are individuals who were denied entrance to a Carson City, Nevada government building after refusing to remove clothing bearing symbols of motorcycle organizations. Okay. Then it says, Appellants' underlying suit claims that a court policy banning individuals who are wearing such clothing from two floors of the government building violates the First Amendment. Because appellants have demonstrated both probable success in the merits and irreparable harm to reverse. And then when you look at the facts of the case, it tells you about these different motorcycle groups and the different organizations that were belonged. But more importantly, when you look at back on page 8 of that decision, it says the rules at issue, and this is critical in this case, are aimed squarely at expressive conduct. That's the words that the Ninth Circuit used in the complex, specifically limiting the words, pictures, symbols, and markings that people may wear within the building. Actually, in Sam Martano, if you read that, they say it's a limited public forum because it's a courthouse. It's actually, they actually limit it. They say this is a limited public forum. We're going to give more discretion to the government in what it can do because it's a limited public forum. Here in this case, we actually have a broader public forum. It's a fair open to the public where you pay general admission. It's on a public park. And, of course, there's many, many factors that intertwine it with the city itself. I would say when you compare the public, the limited public forum in Sam Martano, the courthouse, that the fairgrounds in a public park is a broader forum, broader public forum. Well, you keep calling it a private event. It's not like we had a party at my house and I invited you and I didn't want you to come in. This is a large organization. And I think it's a non- Well, I would not think, I would think if you look at the Sam Martano case, it seems to say you can't prevent them from wearing patches, motorcycle patches, saying that you're a member of the Hells Angels in a limited public forum. And it seems to me that this type of fairgrounds in a public park and what it's doing is a much broader from a constitutional analysis, something that we would want to give less scrutiny to or less deference to in terms of trying to suppress ideas. Well, I think it's self-evident, but I think if you look at this multitude of fairground cases and it talks about how the fairground is probably, and parks are the most widest types of forums that you could engage in sort of a free exchange of ideas and things of that nature, I think that's historical. I assume your brief cites some cases that you would say support the idea that you have a public forum analysis when there's a private organization that does an event in a park. Sure. There are several cases in which I cite. We'll look at that. Now, you may want to continue to respond further to Judge Rawlinson, or you may want to reserve your time for rebuttal. It's up to you. I'm going to go ahead and reserve the remainder of my time because I do think the issue of expressive conduct was squarely addressed in San Moncarno, and that, I mean, it's directly on point in terms of patches. And it's just not what they would suggest. It's only one guy wearing an American flag and it says try to take this off or whatever it said. No. It's much more complicated than that because if you look at the facts. Thank you very much. I'll reserve the remainder. Yeah. Reserve your remaining time and then see what you need to address after. Very good. I'll reserve their say. Thank you very much, Your Honor. You know, two counsel are splitting time, right? Here's how our procedure normally works. We understand you want 10 minutes per side. Now, if Mr. Simonian goes first, he has to stop after 10 minutes. So if he goes beyond that, he'll be taking time from Ms. Lacey. So the two of you have to work that out. Go for your argument then, please. Good morning, Your Honors. May it please the Court, my name is Greg Simonian, and I'm pleased to represent the Gilroy Garlic Festival Association. I'd like to address three broad points. First of all, I'd like to respond directly to the comments made during appellant's opening remarks. Secondly, I would like to talk about state action since, as far as the Garlic Festival is concerned, that is a huge threshold issue. And then I will touch again on the expressive conduct issues. I do want to talk about the discussion of the Hurley case, the United States Supreme Court case. It is cited in our brief. It is not cited for the proposition having to do with expressive conduct, however. The Hurley case is a case that talked about coercive speech and whether or not somebody, for example, a parade could exclude certain members from the parade because they expressed a view different. I would say that since we briefed this case, we have read the Gaithright case, which is a case Your Honor, Judge Gould had written or was part of the panel on. And as far as the coercive speech element, I think we would need to take a look at our position in the brief. But Hurley does not stand for the proposition that the test for expressive conduct has somehow been abrogated or changed. We have provided counsel and the panel with a citation to a U.S. Supreme Court decision, the Rumsfeld decision. And the Rumsfeld decision had to do with a consortium of law schools that excluded military recruiters from the campuses. And one of the issues raised in that case was the one of expressive conduct. I think upon a reading of the Rumsfeld case, you will see that the expressive conduct test has not been abrogated, that being the test in Texas v. Johnson. It is still strong. And the Court basically separately analyzes the Hurley issues and the expressive conduct issues. So I would respectfully submit that contrary to counsel's argument here, Texas v. Johnson and the two-prong test for expressive conduct remains in full force. What the U.S. Supreme Court said as far as expressive conduct is concerned, and it did cite Texas v. Johnson, is that we are looking for conduct that is inherently expressive. And I can leave the remainder of the Rumsfeld case. Sotomayor, please stop the time for a moment, please. Certainly, yes. We're going to suspend argument for a few minutes, but we won't use up your time. Can everyone hear me? Sometimes I get a little faint here. I think it's okay. Thank you. I'm okay. We're just we're making this an informal recess until Judge Covello returns. Let's do this. Add two minutes. Add two minutes to Appelli's time. Just in case, Mr. Simonian wants to get back into what he was, like, the framework. And we'll give another couple of minutes on rebuttal also if Mr. Hammack needs it. I'll object to my colleagues. No problem. I'll object to my counsel. That's fine. Okay. So, Mr. Simonian, please proceed. Thank you, Your Honor. Thank you, Your Honor. I gave Mr. Simonian a couple of minutes here extra so he can backtrack for a second. Sure. To backtrack just for a moment, the Hurley case, the U.S. Supreme Court case, is best understood as a case dealing with coercive speech. It is not a case that deals with expressive conduct. That would be Texas v. Johnson. And, again, to summarize, we have the Rumsfeld v. F.A.I.R. case, a recent U.S. Supreme Court case that discusses both of those issues separately, the point being that appellants' comments that somehow the two-part test in Texas v. Johnson has been changed or altered is simply not correct. Moving to the Sammartano case, our brief does take some time to distinguish Sammartano, and I think it's also important to understand the procedural posture of Sammartano when the Ninth Circuit addressed it. At the time that the Ninth Circuit considered Sammartano, it was before the Court on a motion for a preliminary injunction, and it did not analyze the expressive conduct issue. It analyzed the case in terms of preliminary injunction. We're before this Court on a motion for summary judgment that was granted in favor of the festival and the city of Gilroy. And so that being the case, we do have to take a look at the two-part test enunciated in Texas v. Johnson. I'd like to move now to the issue of this. I want to just ask you this, counsel. Would you characterize this as a public forum case? Sammartano? No, the case we are presently hearing. Was the fair a public forum? The fair was open to the public. It is a limited use. Okay. So it's a limited public use. So what's our standard in terms of how we evaluate any restrictions on entrance to the public space? In terms of actually analyzing the policy itself? Exactly. Your Honor, to be honest, we have not briefed that issue in terms of whether the policy is overbroad or vague. The issue was not addressed in the district court below, and we have not briefed it. Okay. If we get to that issue, I'd respectfully request that opportunity. Okay. I do believe, if I could move on. Okay. The threshold issue, from our point of view, Your Honor, as for the Garlic Festival, is that before you get to those issues, before you get to those issues, the question is whether there is State action involved. And that is the basis that the district court granted summary judgment in favor of the Garlic Festival. This Court in Lee v. Katz recognized with approval the Sixth District Court of Appeal opinion in Lansing v. the City of Memphis. And in Katz, this Honorable Court said, We agree with the Sixth Circuit that a street festival organizer given non-exclusive powers over a traditional public forum does not, in the absence of other facts, become a State actor when the State maintains the ultimate power to regulate activities in the forum. I would submit that the Sixth District decision in Lansing v. the City of Memphis is compelling persuasive authority. Is that a Sixth Circuit decision? Did I say Sixth District? Yeah, that's okay. I apologize. Sixth Circuit. All right. So you'd like us, in any event, to say your client is out of here on State action, even if the City has a problem? That's what I'd say, yes. That is what the district court found, and I do believe the analysis is different as to the State. They're totally separate issues, right? So your client received summary judgment on the not a State actor or no State action theory. Correct. The City got summary judgment based on the court's views of expressive conduct, I guess. Correct. Okay. Or lack thereof. Or lack thereof, yes. That's the procedural posture, right. Okay. And so when we look at the facts in Lansing, they are strikingly similar to the facts here. Both cases involved nonprofit organizations who, by virtue of a permit, a limited use permit or lease, occupied public land for a short period of time for a festival or other event. The nonprofits in both cases were required to utilize local police for traffic control and security. The City, and this is important, retained ultimate control over the public grounds, and the City retained ultimate control over traffic control and safety. And if you take a look at the discussion of the permit requirements in the Lansing case, they're virtually identical to the permit requirements that the Garlick Festival complied with as far as the City of Gilroy was concerned. I want to move to the argument raised in the appellant's brief that somehow Mr. Clute acted in a dual capacity and that somehow that altered the character of the removal of these individuals from the festival from private action to state action. The same argument was raised and rejected by the district court. I would say that when we look at Mr. Clute's activities, and they refer to him in the brief as Sergeant Clute, and it is true that he was also employed as an officer with the City of Gilroy Police Department, but I would submit that to say that he was acting in some kind of a dual capacity overstates the evidence to the point of misstating it. At the time that he approached the individuals and spoke to them about their jackets, he was acting solely in his capacity as the volunteer chair of security at the festival. He did not invoke his authority as a police officer with the Gilroy Police Department and tell them himself, follow me. I'm a police officer and you need to remove your vests or else. That didn't happen here. Instead, he followed festival procedure, not any police procedure, and he called upon a uniformed police officer, Officer Bergman, who then escorted the individuals to the front gate at which time the individuals were refunded their money. And what we learn from the Lansing decision out of the Sixth Circuit is that mere cooperation between the private enterprise and the governmental entity simply does not rise to the level of merger required for a finding of state action. And I find that word merger to be a very powerful, strong word. I think it is consistent with other decisions in the Ninth Circuit that talk about something more than a single request for police assistance, and that's what this was. This was a simple, single request for police assistance. The record before this Honorable Court also contains the deposition of Officer Bergman, and she has testified in her deposition that this was nothing more than a standard citizen contact. So there is nothing about this contact that is any different, really, than the contact between the police and Mr. Lansing in the Lansing v. City of Memphis case. What the Ninth Circuit recognizes in terms of triggering state action is really some active and significant police intervention that demonstrates a substantial degree of cooperation between the police and the private actor, and that simply is not present under the circumstances of this case. You have two minutes before you get into Ms. Lacey's time. Thank you. When we take a look at, for example, what constitutes state action here in the Ninth Circuit, there, what you had was a concerted series of efforts, not one request, but a series of efforts between the police and a landlord to evict Howerton from his premises. This was considered a sustained joint effort to evict. We don't have those facts here. I think our case stands in stark contrast to the facts there in Howerton. I would like to move briefly to a couple of cases cited by the appellant in their brief. One is the Hampton v. Las Vegas Convention Center case. That case is distinguishable on its facts. There, the Las Vegas Convention Center, the public entity, sought to enforce its hand-built policy through leases with the private trade show promoters. The trade show promoter was effectively compelled through the lease to enforce the government's policy. That's not our case either. You've got less than a minute, so please conclude. Moving to expressive conduct, simply there is no inherent expressive conduct here as identified by Rumsfeld, Texas v. Johnson. There is no particularized message, none. The appellants themselves cannot agree on it. Even if there was, there is no evidence that whatever message they were trying to convey, trying to convey, could be understood on an objective basis by those who heard it. I would ask that this honorable court affirm the decision of the district court's grant of summary judgment. Thank you very much. Thank you. Okay. Stop the clock until counsel is up there. May it please the court, Bronwyn Lacy on behalf of the city of Gilroy. Start the clock again. Thank you, Your Honor. Your colleague, although willing to abandon you if they can win on state action, will give you 10 seconds. How kind. I'd like to address two issues today, first being that there was no state action on behalf of the city, and secondly, that the clothing worn by the appellants was not protected speech. I believe a lot of my arguments overlap with Mr. Simonian, and I'll try not to repeat what he said. However, I do agree with a lot of what he said. Your first argument, will you address Monell? Yes, Your Honor. Okay. Okay. I'll start with state action then. First, there was no state action, no enforcement of the policy by the police officer, Officer Bergman, that was involved in this incident. She did two things. First, she escorted the appellants from the middle of the festival to the front gate. When she was at the front gate, she merely stood by while Mr. Kloot enforced the dress code policy of the association. What about the escorting part? Wasn't that active involvement? No, Your Honor. Escorting the appellants from the middle of the festival had nothing to do with enforcement of the policy. Mr. Kloot could have confronted them in the middle of the festival. He did not have to take them to the front gate to ---- But he didn't. He asked, in fact, he asked the officer to intervene at that point and escort them away from the middle of the festival to the gate. So why wasn't that at that point? I mean, she had the accoutrements of law enforcement and used that to escort them. So why wasn't that active participation? Because it didn't involve actual enforcement of the policy, Your Honor. She didn't tell them that they needed to leave the festival. She didn't tell them that there was a dress code policy and they were violating it. She merely asked them to leave a crowded area with families everywhere around them to go to the front gate. To what end? Her purpose, Your Honor, was the public safety and welfare. She was worried that a confrontation between Mr. Kloot and the appellants could possibly turn violent and endanger the public that was present in this crowded area of the festival. I'm sure you're aware that this is a very large festival and it's very densely populated inside the area. And she was concerned that any sort of violence could injure other people nearby. It would have only been violence if there were an effort to enforce the policy. Correct. And Mr. Kloot informed her that that's what he wanted to talk to them about. She wasn't the one who was talking to them. She didn't say, you know what, you guys need to go to the gate with me because you're in violation of the dress code policy. She merely said, please come to the gate with me. That had nothing to do with the policy. Mr. Kloot could have confronted them in the middle of the festival and told them, we have a dress code policy, you cannot wear insignia. So you need to leave. There was no reason for her to escort them to the gate other than the public safety. And that is why she asked them to go to the gate. Her job at the festival was to ensure the public safety of everyone present. They hadn't done anything. They hadn't done anything at the point. There was, you know, there would not have been any reason to fear any disruption absent the enforcement of the policy. I'm not going to disagree with that, Your Honor. However, she was aware that there was going to be a confrontation. She was informed by another citizen that there was going to be a confrontation. She knew that that was going to happen. Her only choice was either I can let it happen and worry about violence to people in the middle of the festival, or I can escort them to the gate where it will be much safer for the public that was attending the festival. That was her purpose. Her purpose was not to enforce the policy. It was not to ask the appellants to leave the festival. It was to ensure that if violence did occur, it didn't incur where there were families present. And who's to say that if she hadn't escorted the appellants to the front gate that there would have been violence and would have endangered those families? But no violence happened. That's true, Your Honor. But we don't know that if circumstances had been different, there would have been violence. So, therefore, she was not – her actions did not constitute state action when she escorted them to the front gate. Secondly, when she was at the front gate, it was Mr. Kloot that enforced the policy. He's the one who asked them to leave. He's the one who informed them of the policy. He's the one who obtained their refund for them. He's the one who actually escorted them out the gate. Officer Bergman merely stood by to make sure that there was no confrontation, that there was no violence, no one was endangered. And in Barrett v. Hardwood, the court has held that mere presence of an officer is insufficient to constitute state action. And that is basically what the district court held in their ruling. And with all due respect, that creates a very negative public policy where if on a street corner some citizen is doing an action that violates the First Amendment of the Constitution and an officer is merely standing by, then that makes that state action where the officer really didn't do anything. This would be a different case if the officer had just been at the gate when the people got there as opposed to the officer actually escorting the gentleman to the gate. This would be a different case. Mere presence is different than herding the people together and escorting them out, in my view. I respectfully disagree, Your Honor. I think it was two different actions by the police officer. I mean, she knew there was going to be a violent confrontation or a possibly violent confrontation, and therefore she was concerned about the public and therefore escorted them to the gate, which was a lot less crowded. And if there was violence, it wouldn't endanger families. Well, the issue was you were reciting the case to talk about mere presence, and there was a difference between just standing, happened to be there and standing by rather than engaging and escorting them. That's the point I was making. I understand what you're saying, Your Honor. My argument is that there were two different actions by the officer. The first one was the escorting one, and we've already kind of discussed that, and I've presented my argument why I don't think that that was state action, because she was not enforcing the policy. And the second action was just to stand by at the gate while Mr. Kloot enforced the policy. What's your Monell discussion? All right. Monell requires that it be a city policy or municipal policy and or custom and practice of the municipal agency to enforce the policy. In McRoy v. Shimuda, which I can give you the citation if you want, the court said that in 1983, plaintiffs must prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the municipal officers were not discharged or reprimanded. In this case, there's no evidence in the record of repeated constitutional violations. This is an isolated event of a police officer being involved, if you will, in the enforcement of the dress code policy. There's no evidence to show that the officers even knew of the association's policy or that they regularly enforced it. The district court merely relied on the fact that city police officers provide security and or volunteer every year for the Garlic Festival. That's insufficient evidence to show that they knew the policy and they regularly enforced the policy while being at the festival because their main purpose at the festival is to enforce the penal code, not the policies of the association. Furthermore, the actions of Bergman are insufficient. Officer Bergman does not have the authority to make her actions into a policy of the city, and therefore her actions did not create a new policy that the city was enforcing.  The court there held that the city was not liable for isolated or sporadic incidences, and therefore there was no policy and or custom and practice for the city to enforce the dress code policy of the association. And there's no evidence to show that this was a city policy. Everybody has agreed that it was the policy of the association. And therefore under Minnell, there's no evidence to show that the city was a state actor on this policy. I see I have a minute left. I can go into the speech arguments if you wish, but I feel that Mr. Simonian pretty much covered that area, unless you have any further questions. Judge Cabello, Judge Rawlinson, any questions? I have no questions. And I respectfully request that this Court uphold the ruling of the district court. Thank you. Thank you. And, Mr. Hammack, we added the two minutes. Two minutes extra rebuttal time. Yes, I will. Equalize the time we added on the other side. I appreciate it. Thank you very much, Your Honor. Let me reply briefly to some of the points that counsel made. Rumsfeld, I read the decision. It doesn't seem to apply here. If anything, it might even be supportive of our position in the sense that they required the discoordinate views to be put forth at this type of situation. The overbreadth argument. Court asked counsel about the overbreadth of the vague issue. I agree that the lower court never addressed that issue. It did seem to be concerned about it because it didn't get to the issue because it didn't get past State action or expressive conduct. And I can certainly understand counsel's hesitance to want to visit that issue or address that issue because simply they can't defend it. It is absolutely overbroad and vague. It's a super-secret dress code. Even they don't know what the dress code is, because the dress code in the evidence when I asked both Sergeant Klune and Officer Bergman what is the dress code, they said, oh, it's whatever we think that could cause a problem. That's what they said. That's the state of the evidence. That's what the record says. So there's no written dress code. Their dress code is the subjective, 100 percent subjective opinions of Sergeant Klune and Officer Bergman. Now, as to this dual capacity, they like to say Mr. Klune, it's Sergeant Klune. He was the volunteer, and it's always a sergeant, an officer from the Gilroy Police Department who volunteers, quote, unquote, to be head of security for that year's bottom line. In the record, as before this Court, at Officer Bergman's deposition, I asked her the following question. Do you recall whether or not Sergeant Klune, was he the one basically in charge or were you in charge, or do you recall anything in terms of the dynamics between you and Sergeant Klune? Answer. Sergeant Klune would have been in charge. Had he either been in uniform, he would have been my direct supervisor. In festival clothing, basically, this was considered a festival party and function that we were providing security for, so I would take direction under him under either circumstance. Question. So either if he was there as part of the Garlick Festival security force and not in his capacity as a police officer, or if he was there as a police officer, you were going to take direction from him in either capacity, correct? Correct. Question. And the reality of the situation is that he's a sergeant on the police port that you have known for many years, correct? True. And he's your superior officer, correct? True. And whether he was wearing a T-shirt that said the Garlick Festival or the City of Garlick Police Department, you were going to follow his orders no matter what, correct, so long as they were lawful? Correct. Let's reality check here for a second. Officer Bergman, a security officer, a private citizen, doesn't trump a police officer. A sergeant trumps of the police department does trump Officer Bergman. Officer Bergman was taking orders from Sergeant Clute because he is her direct supervisor. Whether he claims and wants to split hairs and say on this particular day I'm not wearing a police uniform, I'm just head of security. The head of security does not order, a head of a private security company does not order the police around. That's reality. But a sergeant does. Now, also there was a lot of discussion by counsel about what was Officer Bergman doing. What was she doing? She was trying to protect the public from safety and threats of violence and this and that. That's nowhere in the record. Her impressions of why she did it or what was she concerned about is nowhere in the record. That's counsel's own interpretation. Maybe that's true, maybe that's not, but it's certainly not in the record. The only thing that's in the record that I just read to you is that Officer Bergman was going to follow the instructions of Sergeant Clute, period. No more, no less. Now, there are several ironies in this case. Number one, the appellate, the appellees keep arguing there's no particularized message, it's not to be understood. But on the other hand, they don't like their message. Their message is offensive. It's offensive to failure of values. It can cause destruction. In other words, there's something wrong with their message. If the message can't be understood, if it's not particular, they're certainly offended by it, so it must be offensive in some ways. They can't have it both ways. They can't have their cake and eat it, too. Not only that, they all say security. They're afraid of biker warfare, biker gang warfare. What's the record? The record is that these are law-abiding citizens. They have steady jobs. They have kids. They have homes, mortgages. They pay taxes. They're a member of a fraternal organization. The focus of that fraternal organization is brotherhood. It's a brotherhood of men with a love and a passion for motorcycles, more particularly Harley Davidson. And also the top hatters perform community service in a charitable type of way. The proof of the pudding is in the tasting. I think, Your Honor, you noted it right on the table. Was there violence? Did they get upset? Did they start pulling guns out and start shooting people? No. What they did is they peacefully left, and they hired a lawyer, myself, to address their grievances in a court of law. They acted appropriate at all times. They acted the way citizens of this country should act. And these citizens, Your Honor, they need your help. They need this Court's help. This is their last chance. And they placed this sort of sacred trust in this Court, and they're confident and I'm confident that that trust that they placed in this Court to allow them to redress their grievances, to allow a jury to hear their case, that trust is not misplaced. Counsel, could you briefly address the Monell issue? It was clearly a custom and practice of the police department. The Gilroy Police Department, ever since the fair has been in existence, has always provided the security. They always have been at the head of security, has been a city of Gilroy Police Department person. But to enforce this particular policy. They're the means of enforcement. Mr. Kloot, in his T-shirt, is not going to enforce this policy. Officer Bergman, in her full regalia, in her gun, acting under color of law from the city of Gilroy Police Department, she's the one that's going to enforce the policy, not Mr. Kloot. I'd ask that the case be reversed and remanded for the reasons I stated. I note that this is the second time we've been up on this case. I hope if there's a third time, I'll be sitting over there, at least, as the attorney. Thank you. I would appreciate the fine argument of all counsel. The case will be submitted, and the court shall recess or adjourn on whichever.
judges: Gould, Rawlinson, Covello